DANIEL LEE MAYCOCK
20 Brancaster Close
Amington
Tamworth, Staffordshire, England, B77 3QD
Phone Number: +447577226071
Email Address: daniel.maycock1@gmail.com

Self-Represented

**FILED**

OCT 10 2024

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

DANIEL LEE MAYCOCK,

          Plaintiff,

    v.

CLOUDFLARE, INC.,

          Defendant

)
)
)
)
)
)
)
)
)
)
)

Case No.: **CV24-7102**

COMPLAINT FOR: Disclosure of Information

## I.  **INTRODUCTION**

1.     This claim seeks to compel Cloudflare, Inc. to disclose the identities of the operators behind the website "Debunking Tamworth," which has published false and defamatory statements about the Plaintiff, Daniel Maycock. The defamatory articles have severely damaged Mr. Maycock's personal and professional reputation, causing emotional distress and significant harm to his career prospects, political aspirations, and family life.

2.     The Plaintiff is pursuing defamation proceedings in the High Court of Justice in England but requires this Court's assistance to obtain critical information from Cloudflare, Inc. Without the disclosure of the website operators' identities, the Plaintiff cannot take the necessary legal steps to address the defamatory content in the UK. This request is made under **28 U.S.C. § 1782**, which allows the Court to assist in gathering discovery for foreign legal proceedings.

Through this claim, the Plaintiff seeks to hold those responsible for the defamatory publications accountable and restore his personal and professional standing.

## II. JURISDICTION

3.       This Court has jurisdiction under **28 U.S.C. § 1332** because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states and a foreign state.

4.       This Court has jurisdiction under **28 U.S.C. § 1782**, which allows it to provide assistance to foreign tribunals by enabling discovery for use in foreign legal proceedings. The Plaintiff, a British citizen, intends to initiate defamation proceedings in the High Court of Justice in England upon identifying the operators of 'Debunking Tamworth' (www.debunkingtamworth.com). Cloudflare, Inc., a U.S.-based entity, possesses the identifying information of the website's operators, placing it within the Court's jurisdiction for the purpose of compelling discovery. The jurisdiction over Cloudflare is appropriate as it is headquartered in California, and its services involve direct interaction with the website under scrutiny.

## III. VENUE

5.       Venue is proper in this District under **28 U.S.C. § 1391(b)** because Defendant Cloudflare, Inc. is headquartered in this District. A substantial part of the events giving rise to the claim occurred in this District, specifically through Cloudflare's involvement as the intermediary service provider. Additionally, under **28 U.S.C. § 1782**, this District has jurisdiction to assist in gathering discovery for foreign legal proceedings, making it an appropriate venue for this matter. A substantial part of the events giving rise to the claim occurred through Cloudflare's provision of intermediary services to the website.

## IV. PARTIES

6.       **Plaintiff:** Daniel Maycock, a resident of Tamworth, Staffordshire, England, is a distinguished individual with a multifaceted career in public service, scientific research, and entrepreneurship. Most

recently, Mr. Maycock placed second in a PhD application and is set to commence an MSc in
Microbiology and Infectious Diseases at the University of Birmingham. His academic and career
aspirations include completing a PhD, attending Post Graduate Medical School, and contributing to
biomedical research and public health advancements.

7.      As a former Deputy Mayor of Tamworth, Mr. Maycock has held key leadership roles, including
Chair of the Health & Wellbeing Committee and Chair of the Audit & Governance Committee, where
he led significant public health and governance initiatives. His work has earned him recognition within
the local community and across Staffordshire County. He is also actively pursuing a political career and
aims to be admitted to the approved list for Members of Parliament, demonstrating his commitment to
serving the public at a national level.

8.      In addition to his academic and political endeavours, Mr. Maycock is a successful entrepreneur,
managing a property portfolio as the Director of HI Residential Properties Ltd and previously overseeing
renovation projects as the Director of Dan Maycock Building Services.

9.      The defamatory content published on "Debunking Tamworth" has not only tarnished Mr.
Maycock's current standing but has the potential to negatively affect his future opportunities in both the
academic and political arenas. The false allegations have resulted in public ridicule, emotional distress,
and professional harm, severely compromising his reputation as a respected leader, scholar, future
political candidate, and his family relationships. As a single parent to two children, Harry (8) and
Isabella (10), Mr. Maycock has struggled to shield his children from the emotional fallout of these
allegations. Additionally, the defamatory content has strained his relationship with his long-term partner,
Nikki, further intensifying the personal toll the false claims have had on his family life.

10.     Additionally, the defamatory statements have significantly exacerbated Mr. Maycock's Complex
PTSD, a condition he has struggled with since his military service in 2007. The recent loss of his mother
in December 2022 has compounded his emotional distress, and the ongoing defamation has only

intensified his mental health struggles during this difficult period. The Plaintiff has experienced profound feelings of despair, which have resulted in multiple suicide attempts in recent times, driven in part by the public and personal harm caused by the false allegations. These mental health challenges have severely impacted Mr. Maycock's ability to support and engage with his two children fully, Harry (8) and Isabella (10), as well as maintain his relationship with his long-term partner, Nikki.

11.     Furthermore, the defamation has affected Mr. Maycock's capacity to work and fully engage in his upcoming MSc in Microbiology and Infectious Diseases at the University of Birmingham, hindering his ability to pursue his academic and professional aspirations. The emotional and psychological toll has left him struggling to manage both his family responsibilities and his career development.

12.     **Defendant:** Cloudflare, Inc., is headquartered at 101 Townsend Street, San Francisco, California 94107. Cloudflare is a technology company that provides essential content delivery networks (CDN), domain name systems (DNS), and distributed denial-of-service (DDoS) protection services to websites, allowing them to operate with increased performance and security.

13.     In the case of the website "debunkingtamworth.com," Cloudflare's services are crucial to the site's functionality, enabling it to remain operational and anonymous by shielding the website's actual hosting provider and the identity of those responsible for its content. Due to the nature of Cloudflare's intermediary role, Cloudflare holds information that could help identify the individuals or entities behind the defamatory content published on "Debunking Tamworth."

14.     Cloudflare's involvement is central to this claim, as the services they provide directly facilitate the ongoing publication of defamatory content while allowing the operators of "Debunking Tamworth" to remain anonymous. As such, Cloudflare possesses the relevant information needed to uncover the responsible parties.

# V. STATEMENT OF FACTS

**Incident 1 (Exhibit – A)**

15.    On October 21, 2023, the website "Debunking Tamworth" published an article titled "Tamworth Borough Councillor, Deputy Mayor, in Unsolicited Cock Shock" which contained false and defamatory statements about me, Daniel Maycock. The article republished a screenshot from a Facebook post made by "Kelly Farrell-Shaw," which indirectly accused me of sending unsolicited explicit images to single-parent Facebook groups. The article stated:

      *a.    "We've been sent rather serious allegations regarding the conduct of a senior Tamworth Borough Councillor [...] who, according to a since deleted post from 2022, has allegedly been sending unsolicited pictures of his private bits to single parent Facebook groups among other claims in the same post."*

            i.    Despite acknowledging that there was no evidence to support these allegations, the website republished and amplified this false narrative, stating:

      *b.    "Now you will note that there is absolutely no evidence to back this up and it could well be utter rubbish. However, we can only guess that this person does have evidence that she may consider providing to the Tory Party to investigate."*

            i.    The original Facebook post was later deleted, further indicating its unreliability, yet "Debunking Tamworth" continued to republish these false accusations (Exhibit - A).

16.    Following the publication of the first defamatory article on both Facebook and the "Debunking Tamworth" website, I contacted the local police. After an investigation, the police confirmed that the Facebook post likely originated from a fake account, underscoring the unreliability of the allegations. However, the police informed me that they could not take further action and advised me to pursue civil

1  legal action to address the defamatory content. This confirmation from law enforcement further

2  demonstrates the unreliability of the original source and weakens any potential defence that the

3  statements were based on legitimate facts or constituted an honest opinion.

4

5  **Incident 2 (Exhibit – B)**

6  17.    On March 4, 2024, the website "Debunking Tamworth" published an article titled "Daniel Cook

7  – Conservatives Hiding Sexual Predators?" which contained false and defamatory statements about me,

8  Daniel Maycock. The article falsely suggested that I was involved in sexual misconduct and that my

9  actions were deliberately ignored by others. The statements included the following:

10

11        *a.    "This was the alleged exposure by Deputy Mayor Daniel Maycock to various ladies in a*

12        *group online, publicly accused by someone since gone to ground."*

13

14              i.    This statement falsely implies that I, in my capacity as Deputy Mayor of

15                    Tamworth, engaged in inappropriate and predatory behaviour by exposing myself to

16                    women in an online group. It suggests criminal misconduct, which severely damaged my

17                    reputation and character.

18

19        *b.    "We find it quite disconcerting that this was left unchecked so far as we are aware, and*

20        *maybe Cook does too. Maycock is very much still in the deputy mayor hot seat with no absences*

21        *that we know of, what does that suggest?"*

22

23              i.    This statement insinuates that my alleged misconduct was deliberately covered

24                    up, further implying that I was protected from facing consequences, which harms my

25                    standing as a public official.

26

27        *c.    "So was Councillor Cook exposing the alleged exposure, did it happen on his watch and*

28        *he was told to keep quiet as he alleges he was regarding Pincher?"*

---

COMPLAINT FOR: Disclosure of Information - 6

> i.    This statement falsely connects me to a larger conspiracy involving the concealment of sexual misconduct, equating me with the political scandal surrounding Chris Pincher.

18.    Additionally, the article included a hyperlink to the defamatory article published on October 21, 2023, which was discussed in Incident 1, under the word "this." The hyperlink directed readers to the earlier defamatory article titled "Tamworth Borough Councillor, Deputy Mayor, in Unsolicited Cock Shock." The context of the hyperlink was the following sentence:

> a.    *"However, we do wonder given the timeframe, if he is making the broad statement in relation to this story we published some time ago and we've never heard anything at all about since."*

> i.    The inclusion of this hyperlink perpetuates the earlier false allegations and reinforces the defamatory narrative, compounding the reputational damage caused by the continued publication of these false claims.

19.    The defamatory statements referenced in Incident 2 were published on March 4, 2024, and directly linked to the defamatory article from Incident 1. This connection between the two articles has caused additional harm to my reputation.

**Incident 3 (Exhibit – C)**

20.    On September 5, 2024, the website "Debunking Tamworth" published an article titled "Exclusive: Oh Andy Cooper, What Have You Done!" that indirectly and suggestively referenced me, Daniel Maycock, associating my name with scandalous behaviour. While not making direct accusations, the article implied that I either agreed with or was involved in improper conduct, causing deliberate harm to my reputation. The defamatory statements included the following:

a. *"It is no-one's business to judge anyone for their sexual proclivities and no doubt we all have something that we would not wish to be revealed. (Former Councillor Dan Maycock will no doubt agree)."*

    i. This statement falsely implies that I have engaged in inappropriate or morally questionable sexual conduct. The reference to me alongside Andy Cooper's alleged behavior insinuates that I have hidden sexual secrets, damaging my reputation. The phrase "will no doubt agree" also includes a hyperlink to the earlier defamatory article published on October 21, 2023 (described in Incident 1), reinforcing the original defamatory claims and compounding the harm to my reputation.

b. *"Just because you don't like it, you don't get to judge others. We put normal in quotes simply because getting into debt with someone for kicks is not really something this writer could ever understand at all."*

    i. Although this sentence appears to downplay judgment, the broader context of the article, especially in connection to me, suggests that I have been involved in questionable activities, further harming my reputation.

21. Additionally, the article included a manipulated image of me holding a political poster during a campaign, with a sexualised image of Sam Smith superimposed onto the board I held. This image falsely suggests that I am publicly associated with inappropriate, sexually explicit content, compounding the defamatory nature of the article and subjecting me to public ridicule and embarrassment.

22. The article was published after I was not re-elected in the May 2024 Local Elections, which further suggests that the intent behind this publication was to damage my reputation at a politically sensitive time.

**Incident 4 (Exhibit – D and E)**

23.     On September 14, 2024, the website "Debunking Tamworth" published an article titled "Dan Maycock Screams 'Abuse' – Debunking Damaged His 'Reputation'" in direct response to my report to Cloudflare. The article contained several false and defamatory statements designed to mock and undermine my legitimate efforts to protect my reputation from defamatory content. The statements included the following:

> a.     *"Oh Mr. Maycock. Have you not heard of the Streisand effect? Former Councillor Maycock has fired off an abuse report to one of our providers Cloudflare complaining that Debunking Tamworth has ruined his 'professional reputation' and 'public standing'."*
>
>> i.     This statement ridicules my attempt to file an abuse report with Cloudflare, trivialising my complaint by suggesting that I acted irrationally and without justification. The phrase "fired off an abuse report" implies that I overreacted, further diminishing the seriousness of my concerns.
>
> b.     *"Since it has taken him some time to complain about the articles in question that he reported, we can only guess it's taken him a while to decide if he could prove they were not true. He has no doubt been behind the nastygrams we've had in the mailbag threatening us to 'watch our backs' since good reasonable people with professional reputations to uphold say these kinds of things."*
>
>> i.     This statement falsely suggests that I delayed reporting the defamatory articles because I had difficulty disproving the false accusations. It also insinuates that I was responsible for sending threatening messages to the website, painting me as someone who engaged in abusive and intimidating behavior, which is entirely untrue.
>
> c.     *"Unfortunately for Dan Maycock, who ranks as the first person ever to make a serious attempt at having something removed from our site, Cloudflare based in the US is kinda on the*

*side of free speech, and has provided services for actually questionable websites. Fun fact for*
*you Dan. Our website is based completely outside of the UK and completely outside of UK*
*jurisdiction."*

      i.    This statement mocks my attempts to have defamatory content removed by
dismissing the legitimacy of my complaint. It implies that my report to Cloudflare was
frivolous and that the website is beyond legal accountability, further compounding the
harm to my reputation.

   d.  *"Now, some might well wholeheartedly agree with Maycock. Some might say it serves*
*him right for having given someone cause to post allegations about him freely on Facebook for*
*everyone to find it."*

      i.    This statement insinuates that I deserved the defamatory content published about
me because of my alleged behaviour, falsely implying that the original accusations were
justified. This further damages my reputation by reinforcing false narratives about my
conduct.

   e.  *"We assume linking Councillor Maycock to Andrew Cooper's story, was the proverbial*
*straw that broke the camel's back, saying (to quote ourselves): 'It is no-one's business to judge*
*anyone for their sexual proclivities and no doubt we all have something that we would not wish*
*to be revealed. (Former Councillor Dan Maycock will no doubt agree)'."*

      i.    This statement repeats the false and defamatory insinuation from Incident 3,
further associating me with inappropriate sexual behavior and reinforcing the defamatory
narrative from earlier articles.

24.     The article also published my full abuse report to Cloudflare, including my name and referencing hyperlinks to the earlier defamatory articles from Incident 1, Incident 2, and Incident 3. Although my email address and phone number were redacted, the publication of my full name and complaint linked me back to the previous defamatory content, amplifying the reputational damage caused by the original false accusations.

**Incident 5 (Exhibit – F and L)**

25.     On September 25, 2024, the website "Debunking Tamworth" published an article titled "Notice This Notice" in response to a Pre-Action Protocol letter (Exhibit – F) I had sent. The article contained false and defamatory statements that sought to undermine my legitimate legal actions and continue publishing damaging content. The article included the following statements:

> a.    *"Thanks for the letter Dan. Unfortunately, none of the stories we've posted about you meet the criteria for defamation. None of it is posted as factual statements, it is opinion and speculation based on factual information we had at the time."*

>> i.    This statement falsely implies that my concerns about defamation are unfounded and that the content published was based on factual information. By characterising the defamatory statements as "opinion and speculation based on factual information," the Defendants falsely suggest that the accusations against me had a factual foundation despite previously acknowledging the lack of evidence.

> b.    *"If you'd consulted a lawyer rather than DIY you'd know this."*

>> i.    This statement ridicules my legitimate legal action and implies that I was acting without proper legal guidance. It seeks to publicly undermine my efforts and portray my actions as amateurish and unworthy of serious consideration.

c.   *"So good luck and all but you're just keeping your name ablaze on this website when eventually we'd have taken it down as stale news."*

  i.   This statement falsely suggests that I am responsible for the continued publication of defamatory content. The Defendants imply that the defamatory material would have been removed as "stale news" if I had not pursued legal action, when in fact, they continued to hyperlink back to the original defamatory content.

d.   *"Since you insist on making things worse for yourself and you didn't ask nicely, you can wait longer."*

  i.   This statement mocks my efforts to seek legal redress and falsely implies that my actions have worsened the situation. It suggests that my actions have prolonged the publication of defamatory content, further damaging my reputation and emotional well-being.

26.   These statements were published with the intent to discredit my legal actions and falsely imply that the defamatory content was based on fact. The Defendants also sought to blame me for the continued publication of defamatory material, further compounding the harm to my reputation

**Incident 6 (Exhibit – G)**

27.   On September 29, 2024, the Defendant, through the website "Debunking Tamworth," published an article titled "Councillor Police Order - Maycock Sends Proof," which contained the following false and defamatory statements:

a.   *"We've been given some interesting emails showing a Police Order issued against the former councillor for inappropriate behaviour towards another councillor (name redacted). Maycock apparently felt the need to try and justify this to us, proving his ongoing obsession with the matter."*

i.  This statement falsely suggests that the Claimant had an irrational or emotional fixation on the issue, implying mental instability. The use of phrases such as "ongoing obsession" falsely implies erratic or unstable behaviour, further suggesting that the Claimant was responsible for inappropriate conduct warranting police intervention. The redaction of the other councillor's name, while preserving defamatory claims against the Claimant, implies that the incident involves a well-known person who the Defendant seeks to protect, possibly indicating collusion.

b.  *"It's sad, really. He's still blaming his downfall on others when clearly the only one he needs to reflect on is himself."*

i.  This statement implies that the Claimant's difficulties, both personal and professional, are entirely self-inflicted. The defamatory nature of this statement portrays the Claimant as a person unwilling to take responsibility for his actions, further damaging his personal and professional reputation.

c.  "He might need to take a break for his mental health. No shame in it. Everyone needs a rest sometimes, especially if you've been through a loss."

i.  This condescending comment, while cloaked in feigned concern, insinuates that the Claimant is mentally unstable and needs to step back from public life due to his supposed inability to cope with recent events. This causes further reputational harm, as it calls into question the Claimant's mental fitness and capability to function professionally.

**Incident 7 (Exhibit – H)**

28.    On September 28 and 29, 2024, the Defendant, through the mailbag section on the website Debunking Tamworth, published three entries titled "Impressive" and two separate entries titled "Police Time," which contained the following false and defamatory statements:

    a.   "Impressive" (Published 29/09/2024):

        i.   *"Impressive Dan not only shared campaign chat info with the police but also a random politics blog. Puts him in great stead for future candidacy roles (on top of the allegations!)."*

            1.   This suggests that the Claimant irresponsibly shared sensitive information and sarcastically implies that such behaviour diminishes his political standing. Additionally, the statement "on top of the allegations" perpetuates the earlier false claims of misconduct, which continue to damage the Claimant's political reputation.

    b.   "Police Time" (Published 28/09/2024 and 29/09/2024):

        i.   *"He wasted police time over being called a prick, if I were a copper, I'd have called him one for that."*

        ii.   "Wasting police time is a crime, why did the police not say sorry Mr. Maycock but you are a prick for that alone."

            1.   These statements falsely imply that the Claimant engaged in criminal conduct by wasting police time and suggest that the police should have insulted him. Such comments not only damage the Claimant's reputation

but also attempt to discredit his legitimate engagement with law enforcement.

    c.  The Debunking Tamworth response in one entry:

        i.  *"It should never have got that far."*

            1.  This response reinforces the defamatory narrative that the Claimant's actions were baseless and that any involvement of the police was unnecessary, further harming the Claimant's credibility.

**Incident 8 (Exhibit – I)**

29.    On September 29, 2024, the Defendant published an article titled "Featured Reader Letter: Maycock's Missteps, Learning For Others", containing the following false and defamatory statements:

    a.  *"Daniel Maycock's recent actions offer a clear example of what political figures should avoid when dealing with media criticism and personal disputes. By focusing on emotional reactions, issuing misguided legal threats, and escalating minor conflicts, Maycock has not only damaged his personal reputation but also drawn negative attention to internal party dynamics."*

        i.  This statement falsely implies that the Claimant's actions were driven by emotion and political immaturity despite the fact that the Claimant is no longer a councillor. The article deliberately misrepresents the legal steps the Claimant has taken, such as seeking a Norwich Pharmacal Order, and casts them in a personal, rather than professional, light. The article also suggests that the Claimant has damaged internal party dynamics when there is no evidence to support this claim.

Furthermore, the Claimant's actions were not politically motivated but instead were personal legal actions to defend his reputation.

b. *"Maycock reacted emotionally to negative articles about him by sending a poorly constructed legal threat. This not only revived interest in the old stories but also made him look desperate and unprepared. Aka the Streisand effect."*

    i. This statement is both misleading and defamatory, as it implies that the Claimant's legal responses were poorly thought out and driven by emotion rather than by careful legal strategy. The Claimant's pre-action protocol letter was prepared in accordance with established legal procedures, and the suggestion that it was "poorly constructed" is a deliberate misrepresentation of the Claimant's professional legal efforts. Additionally, the claim that the actions "revived interest" is misleading and attempts to blame the Claimant for the publication of further defamatory content by the Defendant.

c. *"After losing his council seat, Maycock's actions were seen as driven by resentment. His post-election complaints and attempts to escalate personal disputes suggested that he was more concerned with settling scores than moving forward productively."*

    i. The article falsely implies that the Claimant's actions are motivated by personal grudges rather than legitimate legal concerns. It attempts to frame the Claimant as overly emotional and vindictive when, in fact, the legal steps he has taken are necessary to protect his personal and professional reputation following false and defamatory allegations. Additionally, there is no political relevance to these matters, as the Claimant is no longer an elected official.

**Incident 9 (Exhibit – J)**

30.     On September 29, 2024, the Defendant, through the website Debunking Tamworth, published an article titled "The Illusion of Personal Responsibility: Kemi Badenoch's Conservative Conundrum in Tamworth," which contains the following false and defamatory statements:

> a.  *"Sexual Misconduct Allegations: In July 2022, Pincher faced multiple allegations of sexual misconduct, which led to significant backlash. It was reported that he had groped two men at a private members' club. This incident prompted his resignation from his role as Deputy Chief Whip, and he subsequently faced calls to resign as an MP, but he stayed ensure the max salary possible before going…. Paul Turner, past leader of the council, remarked that he would not be addressing a complaint of Maycock above, as doing so could reflect poorly on the Conservative Party. This led me to ponder how many others were aware of Pincher's actions before 2022 yet chose to remain silent or cover them up, again citing concerns about the party's image."*
>
> > i.  This statement falsely implies that the Claimant was involved in a cover-up of sexual misconduct within the Conservative Party, further insinuating that the Claimant, along with others, may have been complicit in shielding Pincher's misconduct to protect the image of the Conservative Party.

31.     The article reuses a manipulated image from previous defamatory articles featuring the Claimant holding a political poster altered to show an explicit and inappropriate image of Sam Smith in a sexually suggestive pose. The use of this image is intended to subject the Claimant to public ridicule and further damage his reputation by falsely associating him with inappropriate or explicit content.

1   **Incident 10 (Incident – K)**

2   32.     On September 29, 2024, the Defendant, through the Debunking Tamworth website, published

3   several Mailbag entries targeting the Claimant. These entries contain the following false and defamatory

4   statements:

6   33.     **Victim:** The mailbag entry falsely claims:

8       a.   *"Maycock won't stop because he loves the drama, more so playing the victim. He will tell*

9           *anyone who will listen what a hard life he has had. Apart from serving in the army (to*

10           *which I'm grateful for) he's lead a great life, but he'll moan about being a single dad,*

11           *you don't see single moms constantly going on about it. No, they just get on with it. We'd*

12           *suggest military service probably messed his head up more than this site ever will."*

14          i.   This suggests that the Claimant thrives on victimhood, dismisses his experiences,

15             and makes light of his mental health struggles, implying his military service

16             "messed his head up."

18   34.     **Swearing:** The mailbag entry falsely states:

20       a.   *"And don't forget the time Daniel Maycock had a go at people for swearing round his*

21           *son, people could be a little more considerate but maybe don't take your child*

22           *somewhere where there are loads of adults who you know swear a lot."*

24          i.   This statement trivializes a legitimate concern the Claimant raised about

25             inappropriate behaviour around his child, presenting him as unreasonable for

26             expecting consideration in public spaces.

35.    **Observing:** The mailbag entry falsely references:

    a.   *"Victim – Maycock, often seen as an early embodiment of the '[Redacted]' mentality, had a tough life. Being a single parent was challenging, and he believed it was even more difficult to navigate the world as a white male. As Maycock spoke, nods of agreement circled the table from the other white [Redacted] males. Little did they know, I sat among them—a refugee from Yugoslavia, quietly observing their conversation. lol."*

        i.   This entry makes baseless assumptions about the Claimant's worldview, falsely implying that he views his difficulties through a lens of racial victimhood, which is entirely unsubstantiated.

## VI. IMPACT OF DEFAMATION OF PLAINTIFF

36.    The defamatory statements published by "Debunking Tamworth" have profoundly impacted Mr. Maycock's personal and professional life. These false and baseless accusations have caused severe emotional distress, significantly exacerbating his pre-existing mental health condition, Complex PTSD, which originated from his military service in 2007. The relentless defamation has led to multiple suicide attempts as the emotional and psychological toll became overwhelming. The ongoing false allegations have created an unbearable burden on Mr. Maycock, making it increasingly difficult for him to manage his condition.

37.    Professionally, the defamatory publications have severely damaged Mr. Maycock's reputation. His standing as a public figure—particularly in his roles as a former Deputy Mayor of Tamworth and Chair of key committees—has been irreparably harmed. The allegations have caused public ridicule, undermining his credibility and professional reputation. As a result of this damage, Mr. Maycock lost his local councillor seat in the May 2024 elections, a position worth approximately £8,000 per year, also being turned down from employment of £30,000 per year as a direct result of the articles. Furthermore, he missed the opportunity to become Mayor, which would have furthered his political career and

leadership roles in the community. The defamation has also severely affected his aspirations of pursuing a political career, including his ambition to be placed on the approved list for Members of Parliament.

38.    The defamatory content has also hindered Mr. Maycock's academic and career progression. He recently placed second in a PhD application and is set to begin an MSc in Microbiology and Infectious Diseases at the University of Birmingham. However, the stress caused by these defamatory articles has made it increasingly difficult for him to focus on his studies and career advancement. The reputational damage has had a chilling effect on his standing in the scientific community and reduced his chances of securing future academic or research positions. As a result, Mr. Maycock's aspirations of pursuing a PhD and attending Post Graduate Medical School have been compromised.

39.    The defamatory publications have also caused immense harm to Mr. Maycock's family life. As a single parent to two young children, Harry (8) and Isabella (10), Mr. Maycock has faced the difficult task of shielding his family from the fallout of these defamatory allegations. The emotional distress has significantly impacted his ability to be present and provide stability for his children and long-term partner, Nikki. The defamation has created additional strain within his family, compounding the already significant emotional and psychological burden he carries.

40.    The impact of these defamatory publications has been widespread, resulting in severe and lasting harm to Mr. Maycock's personal and professional reputation. The continued publication and amplification of these false allegations have caused irreparable damage to his mental health, career prospects, and family relationships. Public ridicule, professional setbacks, and ongoing emotional distress have created significant barriers to his well-being and future opportunities, with the defamatory articles acting as a persistent source of harm.

## VII.    CAUSE OF ACTION

### FIRST CAUSE OF ACTION

((Request for Disclosure under Norwich Pharmacal Order (or equivalent U.S. discovery order))

### (As against Defendant: Cloudflare, Inc.)

41.    **Request for Disclosure:** Plaintiff seeks the court's intervention to compel Cloudflare, Inc. to disclose the identities and contact details of the operators of the website "Debunking Tamworth" (debunkingtamworth.com).

42.    **Cloudflare's Role:** Cloudflare, Inc. provides DNS and other web security services to "Debunking Tamworth" and, therefore, holds crucial information that can identify the individuals responsible for the defamatory content published on the website.

43.    **Necessity for Disclosure:** The information held by Cloudflare is essential for the Plaintiff to pursue legal proceedings in the United Kingdom against the individuals responsible for defamation. Without this information, the Plaintiff cannot proceed with the case in the UK to protect their reputation and seek remedies.

44.    **Federal Rules and Legal Basis for Disclosure:** The Plaintiff brings this action under the **Federal Rules of Civil Procedure 26(b)(1) and Rule 45. Rule 26(b)(1)** permits parties to obtain discovery regarding any nonprivileged matter relevant to any party's claim or defence, which is necessary to identify the individuals responsible for the defamatory content. **Rule 45** allows issuing a subpoena to command the production of documents or information, compelling third-party disclosure essential to resolving the dispute.

45.    **Assistance to Foreign Tribunals:** This Court has jurisdiction to assist foreign tribunals under **28 U.S.C. § 1782**, which permits U.S. courts to assist foreign litigants in obtaining discovery necessary for use in foreign legal proceedings. In ***In the Matter of Application of Eleanor de Leon v. Northridge Capital, LLC***, **No. 19-mc-0197 (D.D.C. 2019)**, the court granted the petitioner's request for discovery

from U.S.-based entities to assist in legal proceedings in the Cayman Islands. The petitioner satisfied the statutory requirements, demonstrating that the respondents were "found" in the district and that the requested discovery was for use in foreign proceedings. The court also evaluated discretionary factors, concluding that the request did not circumvent foreign proof-gathering restrictions and that the discovery sought was relevant.

46.    Similarly, the Plaintiff in this case seeks to compel Cloudflare, Inc., a U.S.-based entity, to disclose the identities of the operators of "Debunking Tamworth" for use in a defamation claim in the UK. The Plaintiff satisfies the requirements of **28 U.S.C. § 1782**, as the discovery is for use in UK legal proceedings, Cloudflare is "found" in the district, and the Plaintiff has a legitimate interest in obtaining the information.

47.    Additionally, like the court in *de Leon*, this Court should find that granting the Plaintiff's request for discovery does not circumvent foreign proof-gathering restrictions and is relevant to the defamation proceedings in the UK.

48.    **First Amendment Consideration:** The Plaintiff acknowledges the right to anonymity under the First Amendment. However, this right is not absolute, particularly in defamation cases where the harm caused by the speech outweighs the right to remain anonymous.

**Relevant Case Law:**

49.    ***Doe v. 2TheMart.com Inc., * 140 F. Supp. 2d 1088 (W.D. Wash. 2001):** This case established a four-part test for disclosing an anonymous speaker's identity:

      a.  **The Good Faith Requirement:** The subpoena must be issued in good faith and not for any improper purpose.

      b.  **Relevance to the Claim or Defence:** The information sought must relate directly to a core claim or defence of the case.

    c. **Materiality of the Information:** The identifying information sought must be essential to the litigation and directly impact the core legal claim.

    d. **Availability from Other Sources:** The information cannot be readily available from alternative sources.

50. **Relevance to Plaintiff's Case:** This case is directly applicable to the Plaintiff's request to compel Cloudflare to disclose the identities of the operators of "Debunking Tamworth." The four-part test established in ***Doe v. 2TheMart.com Inc.*** can be used to support the Plaintiff's argument for disclosure, as follows:

    a. **Good Faith:** The Plaintiff is pursuing disclosure in good faith to address defamatory content, not for any improper purpose. The Plaintiff seeks to identify the operators to bring legitimate defamation claims in the UK.

    b. **Relevance to Claim:** The identifying information is crucial to the Plaintiff's defamation case. Without knowing the identities of the individuals responsible for the defamatory content, the Plaintiff cannot bring the necessary claims in the UK courts.

    c. **Materiality:** The information sought is material to the case, as it is essential for the Plaintiff to identify the website operators in order to pursue justice. Without this information, the defamation claim cannot proceed.

    d. **No Other Sources:** The identities of the operators are not available from other sources. Cloudflare is the intermediary service provider with the information needed to identify the responsible parties.

51. In line with ***Doe v. 2TheMart.com Inc.***, the Plaintiff contends that the court should compel disclosure of this essential information under **Federal Rules of Civil Procedure Rule 45.**

52. ***Sony Music Entertainment Inc. v. Does 1-40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004):** In this case, Sony Music sought the disclosure of the identities of anonymous individuals who were alleged to have illegally shared copyrighted music files. The court acknowledged the right to anonymity on the internet but stated that this right is not absolute, especially when a prima facie case of wrongdoing is

presented. The court applied a five-part test to determine whether to compel the disclosure of the defendants' identities:

    a. **Prima Facie Case:** The plaintiff must demonstrate a valid legal claim.

    b. **Specificity of the Discovery Request:** The request must be specific to the wrongdoers and related to the wrongdoing.

    c. **Absence of Alternative Means:** The plaintiff must show that there is no alternative way to obtain the necessary information.

    d. **Centrality of the Information:** The information must be essential to the plaintiff's case.

    e. **Balancing Interests:** The court must weigh the plaintiff's need for disclosure against the defendants' right to anonymity.

53.    **Relevance to the Plaintiff's Case:** The five-part test set out in Sony Music is directly applicable to the Plaintiff's request for the disclosure of the identities of the operators of "Debunking Tamworth." As in Sony Music, the Plaintiff can argue that:

    a. **Prima Facie Case:** You have established a prima facie case of defamation under UK law by showing that the defamatory statements published on "Debunking Tamworth" have caused significant harm to your personal and professional reputation. The content of these statements is false and damaging, fulfilling the requirement of actionable harm.

    b. **Specificity of the Discovery Request:** Your discovery request is narrowly focused on the operators of "Debunking Tamworth." You are seeking only the identifying information of the individuals responsible for the defamatory statements, and your request is directly tied to these specific claims of defamation. The discovery is not a broad or generalised request for information but rather a targeted effort to unmask the responsible parties.

    c. **Absence of Alternative Means:** Cloudflare, as the DNS and web security provider, holds the only means of identifying the operators of "Debunking Tamworth." Because the operators have concealed their identities behind this service, you cannot obtain the required information from any other source. This makes Cloudflare the sole source for uncovering the individuals responsible for the defamatory content.

d. **Centrality of the Information:** The identifying information of the operators of "Debunking Tamworth" is essential to your defamation case in the UK. Without knowing who these individuals are, you cannot bring legal action against them to seek remedies for the harm caused by their defamatory publications. This information is at the core of your ability to hold the responsible parties accountable.

e. **Balancing Interests:** While the operators of "Debunking Tamworth" may argue for anonymity under the First Amendment, your need to address the significant harm caused by the defamatory statements outweighs their right to remain anonymous. The balance tips in your favour because the statements have caused serious reputational harm, and you are pursuing legitimate legal action, not attempting to stifle free speech.

54. ***Highfields Capital Management L.P. v. Doe,*** 385 F. Supp. 2d 969 (N.D. Cal. 2005): This case set a balancing test to weigh the need for disclosure against the right to anonymous speech. The plaintiff must show evidence supporting the claim, and the court must balance the need for disclosure against potential harm to free speech. The balancing test includes the following steps:

a. **Prima Facie Case:** The plaintiff must provide enough evidence to demonstrate that the anonymous speech at issue is actionable (e.g., defamatory). The claim must have a factual and legal basis.

b. **Balancing of Interests:** Once a prima facie case is established, the court balances the interests, weighing the plaintiff's need for the information against the defendant's right to anonymous free speech. The court evaluates whether unmasking the defendant is essential to obtaining justice and whether the harm caused by disclosure is justified.

55. **Relevance to the Plaintiff's Case:** The balancing test from *Highfields* is particularly relevant to the Plaintiff's request for disclosure from Cloudflare, Inc., regarding the anonymous operators of "Debunking Tamworth." The Plaintiff must:

a. **Prima Facie Case:** The Plaintiff has established a prima facie case of actionable harm caused by the operators of the website "Debunking Tamworth." The defamatory

statements published on the site have caused significant damage to the Plaintiff's reputation, both personally and professionally, and have inflicted emotional distress. Under UK defamation law, this constitutes actionable harm. The content in question is not merely an expression of free speech but consists of false, damaging assertions aimed at harming the Plaintiff's reputation. Therefore, the Plaintiff meets the initial threshold requirement set out in *Highfields Capital Management L.P. v. Doe*, **385 F. Supp. 2d 969 (N.D. Cal. 2005)**, demonstrating that the speech in question is actionable and harmful.

    b. **Balancing of Interests:** In the second stage, the court must balance the Plaintiff's need for disclosure against the operators' right to anonymity. In this case, the Plaintiff needs to obtain the identities of the operators of "Debunking Tamworth", which is paramount to pursue justice and remedy the reputational harm caused by the defamatory statements. The Plaintiff cannot proceed with legal action in the UK without the identities of those responsible for the website.

56. While the First Amendment protects anonymous speech, that protection is not absolute, particularly when the speech crosses into defamation. The ongoing harm to the Plaintiff outweighs the operators' right to remain anonymous under these circumstances. The balance of interests, as defined in *Highfields*, tilts decisively in favour of disclosure, as it is essential for the Plaintiff to pursue their defamation claim and obtain legal redress.

57. **Norwich Pharmacal Order and U.S. Equivalents:** Although the Norwich Pharmacal Order is a principle under UK law, which allows courts to compel third parties who have become innocently involved in wrongdoing to disclose information necessary to identify wrongdoers, the Plaintiff seeks similar equitable relief recognised in U.S. law, as evidenced in cases like *Banco Mercantil v. Paramo*, **No. 24-20007 (5th Cir. 2024)**.

58.    **Relevance and Materiality:** The information held by Cloudflare is relevant and material to the Plaintiff's case, as defined by the **Federal Rules of Evidence 401** and **402**. Therefore, it should be discoverable and admissible in these proceedings.

59.    Due Process and Justice: The Plaintiff's right to due process demands the identification of the responsible parties, ensuring they can be held accountable for defamatory content. The balance of interests, as outlined in cases like *Highfields Capital Management L.P. v. Doe*, supports the Plaintiff's request for disclosure. Without this essential discovery, the Plaintiff's ability to seek justice in the UK will be severely compromised.

**Cause of Action - Closing Summary**

60.    The Plaintiff respectfully requests that this Court grants the order compelling Cloudflare, Inc. to disclose the identifying information of the operators of "Debunking Tamworth." The Plaintiff has met the necessary legal standards for disclosure under both U.S. and international law.

61.    **First, under Rule 26(b)(1)** and **Rule 45** of the **Federal Rules of Civil Procedure**, the Plaintiff seeks non-privileged information essential to the pursuit of legal redress in the United Kingdom. The discovery sought is relevant to the Plaintiff's claim of defamation, as the identity of the website operators is central to the Plaintiff's ability to seek justice.

62.    The Plaintiff's case also meets the five-part test for disclosure established in *Sony Music Entertainment Inc. v. Does 1-40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004). The Plaintiff has established a prima facie case of actionable harm, submitted a specific request for the necessary information, and demonstrated that there are no alternative means of obtaining this information. The requested discovery is essential to the Plaintiff's defamation claim, and the balance of interests strongly favours disclosure.

63.    Furthermore, under the two-part balancing test in *Highfields Capital Management L.P. v. Doe*, **385 F. Supp. 2d 969 (N.D. Cal. 2005)**, the Plaintiff has presented sufficient evidence to establish a

prima facie case of actionable defamation. The Plaintiff's need for disclosure outweighs any potential harm to the operators' First Amendment rights, particularly given the defamatory nature of the statements and their substantial impact on the Plaintiff's reputation and emotional well-being.

64.    In addition, under **28 U.S.C. § 1782**, this Court has the jurisdiction to assist foreign tribunals by providing discovery for use in foreign legal proceedings. The Plaintiff relies on In the Matter of Application of *Eleanor de Leon v. Northridge Capital, LLC*, **19-mc-0197 (D.D.C. 2019)** as a relevant precedent. In that case, the court granted discovery for use in foreign proceedings, recognising the necessity of the information for a foreign tribunal. The Plaintiff submits that the same principles apply here, as the information from Cloudflare is crucial for the Plaintiff's defamation case in the UK.

65.    Finally, the balance of interests and the precedents set by *Doe v. 2TheMart.com Inc., Highfields Capital Management,* and *Sony Music Entertainment Inc.* demonstrate that the Plaintiff's right to pursue justice outweighs any privacy or anonymity claims by the website operators. The Plaintiff has demonstrated the importance of this information to their case, and disclosure is essential to protect the Plaintiff's rights and reputation.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, the Plaintiff requests:

66.    Plaintiff requests the court to issue an order compelling Cloudflare, Inc. to provide the names, addresses, contact information, and other identifying information of the individuals or entities operating "debunkingtamworth.com."

67.    Plaintiff requests the court to issue an order compelling Cloudflare, Inc. to provide the names, addresses, contact information, and other identifying information of the individuals or entities hosting "debunkingtamworth.com."

Dated:   04 October 2024
Signed:   *D. Maycock*
Print Name:   DANIEL LEE MAYCOCK